[No. 47231-3-I. Division One. February 3, 2003.]

*In the Matter of the Personal Restraint of* ALLAN PARMELEE, *Petitioner.*

*Allan Parmelee*, pro se.

*Thomas M. Kummerow* (of *Washington Appellate Project*), for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *David J. Eldred, Deputy*, for respondent.

KENNEDY, J. — Allan Parmelee was twice sanctioned for insolence while he was incarcerated for stalking at the King County Correctional Facility in Seattle. In this personal restraint petition, Parmelee argues that the sanctions were based solely on the language he used in two written grievances that he filed, and that such language in written grievances is protected from infringement by the First Amendment. Applying the test articulated in *Turner v. Safley*, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), we conclude that Parmelee's First Amendment rights were not impermissibly infringed. Moreover, Parmelee was properly sanctioned for making a threat in his second written grievance. Threats are not protected by the First Amendment. Accordingly, we deny Parmelee's petition.[1]

---

[1] Parmelee's petition technically is moot because he is no longer incarcerated for his stalking convictions. We have addressed the First Amendment issue he raises, however, because it involves a matter of continuing and substantial public interest. *See In re Pers. Restraint of Mines*, 146 Wn.2d 279, 285, 45 P.3d 535 (2002)

## FACTS

Allan Parmelee was sentenced to serve four consecutive one-year sentences in the King County jail for four misdemeanor stalking convictions. He was released from custody on August 11, 2001.

Before his release, Parmelee was twice sanctioned with 10 days of disciplinary segregation and loss of 10 days of good time for violation of jail rules.

### The August 9, 2000 Incident

On August 9, 2000, Corrections Officer Bonilla provided Parmelee with access into an additional cell where he was permitted to maintain his collection of legal papers. Bonilla was stationed in a control booth from which he was able to close the door behind Parmelee. As the door was closing, Parmelee slammed it back open, talking loudly in Bonilla's direction. Bonilla was unable to understand what Parmelee said to him, but asked whether Parmelee would like to see the Sergeant. Parmelee asked who the Sergeant was and was informed that it was Acting Sergeant Naud. Bonilla stated in a subsequent rule infraction report that Parmelee responded, "she's a bitch and it would be a waste of time." Budhram Aff., Ex. 1-A. Parmelee subsequently denied calling Acting Sergeant Naud a bitch.

Shortly thereafter, Parmelee handed Bonilla a written grievance, which stated in pertinent part:

> My grievance is about the piss-ant officer slaming [sic] the door . . . on me and will not let me move legal papers between cells since I have two cells for legal papers. He says only one cell can be open at a time, per movement/period.

(a court may decide a moot case if it involves matters of continuing and substantial public interest). We have not addressed Parmelee's various due process claims, on the other hand, because they do not meet the necessary criteria for addressing a moot appeal. *See Hart v. Dep't of Soc. & Health Servs.*, 111 Wn.2d 445, 448, 759 P.2d 1206 (1988) (discussing various factors courts consider in determining whether an issue is of continuing and substantial public interest and thus reviewable regardless of mootness).

I tried to solve this problem with staff member c/o Bonella [sic] [at] 4:30 p.m. The officer was being an asshole and appeared to be intentionally trying to give me a hard time for no reason, and would not open both my cell doors at the same time.

I request the following resolution to my grievance. Fire this asshole before someone reacts to his attempt to provoke violently, correct this door problem immediately.

Ex. 1-A to King County's Resp.

Later that night, in response to the incident, Bonilla wrote up and submitted a rule infraction report to his supervisor. He also provided a copy of the report to Parmelee. The report charged Parmelee with one infraction for G-301-Defiance/Insolence/Abuse (hereinafter referred to as "insolence"). G-301 is defined in the Inmate Information Handbook as, "[m]aking flagrant, public statements which are degrading, ridiculing, abusive, insolent, defiant, obscene, and/or which promote disorder." The report stated:

I/M Parmelee . . . handed me an I/M Grievance Form in which he stated I was a pissant officer and an asshole, because I was closing the door behind him when he entered LA02 (I/M Law office) to conduct legal work, as I was instructed to do so by A/Sgt. Naud, so as to keep other I/M's away from his stuff. While the door was closing he slammed it back open, talking loudly in my direction, but I was unable to understand what he said. I also spoke to I/M Parmelee to see if he wanted to talk to the tower Sgt. about his two cell situation. He asked who it was and I told him A/Sgt. Naud, in which the I/M stated she's a bitch and it would be a waste of time.

Attach. A to Parmelee's Pet.

At the subsequent disciplinary hearing, Parmelee pleaded not guilty. The hearing officer found Parmelee guilty of the G-301 infraction, and sanctioned him with 10 days of disciplinary segregation and with loss of 10 days of good time. In support of the sanction the hearing officer wrote:

Again, the grievance procedure needs to be clarified[;] it is a procedure available to you to bring issues to the attention of

this department. The grievance procedure is not a forum to make disparaging, degrading, abusive comments about staff.

I find you guilty of G-301 Defiance/Insolence/Abuse. You stated, "Fire this asshole before someone reacts to his attem[pt] to provoke violently." You also refer to the staff person as, a "piss-ant officer." Also, the infracting officer reported he could not hear what you [were] saying clearly while the door was closing, but spoke with you to see if you wanted to talk to the tower Sgt., and it was then that you stated she was a bitch. Again, you demonstrated you were making degrading, ridiculing, and abusive comments, which is unacceptable behavior.

Ex. 2-B to King County's Resp.

Parmelee appealed this decision. The administrative appeal officer ruled in pertinent part:

You are not being punished or sanctioned for using the grievance process. You will however be held accountable for the language you choose to use, despite being directed not to use degrading language. Since you choose to deliberately use degrading language in your grievances I find it credible that you referred to Sgt. Naud in similar fashion and your claim that it was not so, less credible. I see no indication sanctions were changed as you claim. My review shows no bias on the part of staff. The hearing was initiated within the prescribed time frame[;] it is no longer 72 hours. Your disciplinary hearing is recorded in writing.

Ex. 1-C to King County's Resp.

Parmelee remained in disciplinary segregation while he completed his sentence of 10 days. He served the 10 days of lost good time prior to his release from incarceration.

## The August 15, 2000 Incident

On August 15, 2000, Parmelee was again charged with an infraction, this time after Corrections Officer Lewis, who was distributing mail to inmates, opened a piece of Parmelee's legal mail, in Parmelee's presence, and removed a staple from a document. Parmelee was angered by this.

Lewis stated in his subsequent rule infraction report that Parmelee told him he was "stupid" and did not know what he was doing. Parmelee requested and received a grievance form from Lewis.

A little over an hour later, Parmelee submitted a written grievance while Lewis was making his rounds retrieving inmate service requests and grievances. The grievance included a statement that the jail should "fire this prick [Officer Lewis] because shitheads like him shouldn't be around prisoners" and that the officer should be fired "before his attitude gets him fucked up." Attach. B to Parmelee's Pet.

Lewis submitted a rule infraction report to his supervisor later that evening charging Parmelee with two infractions, one for violating G-301-Defiance/Insolence/Abuse, and the other for making a threat in violation of S-207.

At the subsequent disciplinary hearing Parmelee pleaded not guilty to both charges, and provided a written statement in response. The hearing officer found Parmelee guilty of both charges and imposed 10 days of disciplinary segregation and loss of 10 days of good time. The hearing officer stated the basis of the decision in a written report, stating the following:

> First, the grievance procedure needs to be clarified[;] it is a procedure available to you to bring issues to the attention of this department. This grievance procedure is not a forum to make disparaging, degrading, abusive comments about staff.
>
> I am finding you guilty of S-207, threats by your comment, "Fire this prick because shit-heads like him shouldn't be around prisoners befor[e] his attitude gets him fucked up." In your inmate statement you indicated that your comment " 'fucked up' could as it did here, mean he would/will get sued." While you may choose to qualify the meaning of saying the officer's attitude could get him fucked up, it was not qualified at the time, and clearly could be seen as an implied threat.
>
> I also find you guilty of G-301, Defiance/Insolence/Abuse. You stated, and I quote exactly, "Fire this prick because shit-heads like him shouldn't be around prisoners befor[e] his attitude

gets him fucked up. Issue a memo that staples are not to be removed for brainless idiots like this one." Clearly you demonstrated you were making degrading, ridiculing, and abusive comments. This is not and will not be condoned as acceptable while you are housed in KCCF.

Ex. 1-E to King County's Resp.

Parmelee appealed the decision. The administrative appeal officer denied the appeal, stating:

You are not being punished for using the grievance process. You have been advised not to use degrading language which you continue despite the directive not to. I find no conflict with the hearing officer[;] there was nothing apparent to indicate any bias. The recording of your hearing is in writing.

You are not to use degrading language—respect those in authority.

Ex. 1-F to King County's Resp.

Parmelee remained in disciplinary segregation while he completed his sentence of 10 days. Before his release from incarceration, he served the 10 days of lost good time.

On September 5, 2000, just under one year before he was released from incarceration, Parmelee filed the instant personal restraint petition challenging the loss of his good time credit as a result of the two incidents. We subsequently appointed the Washington Appellate Project as counsel on the following issue: "Whether Parmelee's constitutional rights were violated when he was punished for making insolent, abusive and threatening comments about staff in an administrative grievance? *See Bradley v. Hall*, 64 F.3d 1276 (9th Cir. 1995)."

## ANALYSIS

■ In order to obtain relief, a personal restraint petitioner must show that he is under restraint within the meaning of RAP 16.4(b), which provides in part:

A petitioner is under a "restraint" if the petitioner has limited freedom because of a court decision in a civil or criminal

proceeding, the petitioner is confined, the petitioner is subject to imminent confinement, or the petitioner is under some other disability resulting from a judgment or sentence in a criminal case.

Parmelee was under restraint when he filed the petition because he lost 20 days of good time credits as a result of the two infraction decisions.

██ An inmate is entitled to relief from the restraint if he can prove actual and substantial prejudice as a result of constitutional error, or if he can prove nonconstitutional error that inherently results in a "complete miscarriage of justice." *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990); *In re Pers. Restraint of Reismiller*, 101 Wn.2d 291, 293, 678 P.2d 323 (1984). *See also* RAP 16.4(c)(5) (a petitioner's restraint is unlawful if the conditions or manner of the restraint are in violation of the Constitution of the United States or this state, or in violation of the laws of this state).

Parmelee argues that the statements he made in his two written grievances were protected First Amendment speech and thus he was unconstitutionally punished, solely for having made those statements. We disagree with Parmelee that he was punished "solely" for the language contained in the written grievances. He was also sanctioned for verbally calling Acting Sergeant Naud a bitch, and for making a written threat to Officer Lewis. But we agree that one of the bases for both sanctions was the insolent language that Parmelee used in the written grievances that he filed. Thus, the First Amendment issue is squarely before us.

██ A prisoner retains those First Amendment rights that are consistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *Jones v. N.C. Prisoners' Labor Union Inc.*, 433 U.S. 119, 129, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977). In *Turner v. Safley*, 482 U.S. 78, 87-89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), the Supreme Court stated that the proper inquiry turns on whether a prison regulation is "reasonably related" to legitimate penological objectives, or whether it

represents an "exaggerated response" to those concerns. In determining whether the prison regulation is reasonable, four factors are relevant. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984)). Second, courts consider whether there are "alternative means of exercising the [constitutional] right that remain open to prison inmates." Third, courts consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." And fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 89-90.

 Parmelee relies upon the Ninth Circuit's opinion in *Bradley v. Hall*, 64 F.3d 1276 (9th Cir. 1995) for the proposition that his written grievances, no matter how profane and disrespectful, were protected speech that cannot permissibly be regulated by the King County jail's rule prohibiting insolence. In *Bradley*, an Oregon prisoner challenged the constitutionality of a prison regulation prohibiting the use of hostile, sexual, abusive, or threatening language in a written grievance. The prisoner argued that the regulation impermissibly burdened his constitutional right of free speech. The Ninth Circuit agreed, stating that the *Turner* analysis "does not necessarily end at the recognition that the prison rule was adopted to serve, and actually does serve, a legitimate penological interest." *Bradley*, 64 F.3d at 1280. The court went on to balance the importance of the prisoner's infringed right against the importance of the penological interest served by the challenged rule. Concluding that the government's legitimate penological interests were overshadowed by the importance of the prisoner's right of access to the courts in the context of filing a grievance, the Ninth Circuit held that "prison officials may not punish an inmate merely for using 'hostile, sexual, abusive or threatening' language in a written grievance." *Bradley*, 64 F.3d at 1282.

Parmelee urges us to follow Bradley. We are not bound to do so. *See In re Pers. Restraint of Grisby*, 121 Wn.2d 419, 430, 853 P.2d 901 (1993) (while we always give careful consideration to Ninth Circuit decisions, we are not obligated to follow them). Nor are we inclined to do so in this instance, as the United States Supreme Court subsequently criticized the Ninth Circuit's balancing approach in *Shaw v. Murphy*, 532 U.S. 223, 230 n.2, 121 S. Ct. 1475, 149 L. Ed. 2d 420 (2001) ("The [Ninth Circuit] Court of Appeals [improperly made an assessment of the value of the content of a communication] when it 'balance[d] the importance of the prisoner's infringed right against the importance of the penological interest served by the rule.'" (quoting *Bradley v. Hall*, 64 F.3d 1276, 1280 (1995)).

In *Shaw*, the United States Supreme Court reversed the Ninth Circuit's decision of *Murphy v. Shaw*, 195 F.3d 1121 (9th Cir. 1999). A Montana prisoner had been sanctioned for attempting to provide legal advice to a fellow inmate. The sanctioned prisoner sued employees of the Montana Department of Corrections, contending that the discipline imposed violated his First Amendment rights. The Ninth Circuit agreed, concluding that the challenged prison regulations were an "exaggerated response." *Murphy*, 195 F.3d at 1128. In reaching that conclusion, the *Murphy* court applied the balancing test it adopted in *Bradley*, stating, "The *Bradley* balance appears to favor Murphy, suggesting that the prison regulations, as applied to him, are an 'exaggerated response.'" *Murphy*, 195 F.3d at 1127. The United States Supreme Court reversed, stating:

> Because *Turner* provides the test for evaluating prisoners' First Amendment challenges, the issue before us is whether *Turner* permits an increase in constitutional protection whenever a prisoner's communication includes legal advice. We conclude that it does not. To increase the constitutional protection based upon the content of a communication first requires an assessment of the value of that content. But the *Turner* test, by its terms, simply does not accommodate valuations of content. On the contrary, the *Turner* factors concern only the

relationship between the asserted penological interests and the prison regulation.

*Shaw*, 532 U.S. at 230.

Although we disagree with the King County Prosecutor's argument that the Supreme Court thereby "overruled" *Bradley*, it certainly disapproved of the *Bradley* balancing test. We conclude that it is our task to apply the *Turner* factors to Parmelee's claim that his First Amendment rights were impermissibly infringed in this case, without attempting to balance the importance of Parmelee's First Amendment rights against the importance of the penological interests here at issue.

The question is whether Parmelee was impermissibly punished for having used insolent language in the written grievances that he filed against the two corrections officers. Parmelee's right to utilize the grievance process is not at issue—he certainly had the right to utilize the process, and prison authorities may not retaliate against a prisoner for having utilized the process. *See, e.g., Hines v. Gomez*, 108 F.3d 265 (9th Cir. 1997) (inmate brought a cause of action under 42 U.S.C. § 1983, alleging that prison officials filed a false disciplinary report against him because he had filed prison grievances). Parmelee does not contend that he was punished for having used the grievance process. He claims instead that he cannot be punished for the language he used in the written grievances because that language *is* protected by the First Amendment.

■ The first *Turner* factor is whether there is a valid, rational connection between the insolence rule here at issue and the legitimate governmental interest put forward to justify it. King County explains that the insolence rule serves two purposes. First, the rule encourages prisoners to learn how to deal with authority and authority-figures more productively, and less self-destructively, than they may have in the past—indeed, difficulty dealing with authority and authority-figures may be one of the underlying causes of the criminal conduct that landed the inmate in jail in the first place. Second, as also recognized by the *Bradley* court,

rules intended to promote respect for correctional officers " 'help prison staff display the high degree of self-control necessary in the correctional profession,' by heading off situations in which inmates may bait or goad guards into unprofessional conduct." *Bradley*, 64 F.3d at 1280 (quoting expert testimony). Parmelee does not contend that these purposes are not valid, rational, and legitimate. Neither does he contend that there is no valid, rational connection between the insolence rule and these legitimate purposes. We conclude that the regulation passes the first of the *Turner* tests—the rule serves a valid penological purpose and there is a valid, rational connection between the rule and the governmental interest put forward to justify it.

Second, are there alternative means of exercising the right that remain open to the inmate? Most certainly, there were, here. Parmelee and any other inmate can file a written grievance without couching it in terms like those used by Parmelee in this case. Parmelee could have complained that Corrections Officer Bonilla failed to understand that he, Parmelee, was trying to move legal papers between two cells that were available for that purpose, and that he thought that Bonilla was intentionally trying to give him a hard time for no reason by not opening both cell doors at one time. Parmelee did not need to refer to Officer Bonilla as a "piss-ant officer" and an "asshole" in order to explain the basis of his grievance. Neither did he need to demand that the prison authorities "fire this asshole before someone reacts to his attempt to provoke violently," in order to request that the door problem be corrected.

As for the second grievance, Parmelee was apparently under the impression, whether rightly or wrongly is of no consequence here, that corrections officers were not to remove staples from legal documents that had been mailed to inmates by lawyers or courts. He could have so stated in his written grievance after Corrections Officer Lewis removed the staple from whatever legal mailing that he delivered to Parmelee on that day and asked that the rule about staples be explained to Officer Lewis. He did not need

to demand that the jail authorities "fire this prick because shitheads like him shouldn't be around prisoners." Neither was it necessary to the exercise of the right to utilize the grievance process for Parmelee to state that the officer should be fired "before his attitude gets him fucked up." Parmelee does not contend otherwise—he contends, instead, that he had every right under the First Amendment to utilize the language he chose, and that the prison authorities had no business sanctioning him for having done so, because he did so in the text of a written grievance. The regulation at issue passes the second *Turner* test—the alternative means of filing written grievances that do not contain insolent language remained open to Parmelee.

Third, we consider the impact of allowing prisoners, without the possibility of sanctions, to use scandalous, indecent, or insolent language about corrections officers in written grievances. Given the ugly realities of prison life, we have no doubt that the impact would be a veritable barrage of similar written "grievances," filed not for the purpose of addressing prisoner concerns but for the purpose of venting frustration, resentment, and despair. As our Supreme Court recognized in *Dawson v. Hearing Committee*, 92 Wn.2d 391, 396, 597 P.2d 1353 (1979):

> [A] prison is a tightly controlled environment populated by persons who have chosen to violate the criminal law, many of whom have employed violence to achieve their ends. Tension between guards and residents is "unremitting"; "[f]rustration, resentment, and despair are commonplace."

(Quoting *Wolff v. McDonnell*, 418 U.S. 539, 562, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).) The result of forbidding prison authorities from sanctioning insolence such as that of Parmelee in this case would likely be the total or near-total frustration of the very legitimate penological purposes which are served by the regulation here at issue.

Finally, we consider the fourth *Turner* factor, the absence of ready alternatives to the prison regulation. Parmelee suggests none, except the outright exemption of written grievances from the operation of the rule. For the reasons

already stated, we reject that premise. Moreover, such an outright exemption would raise the First Amendment rights of prisoners above those enjoyed by litigants outside the prison population. The *Bradley* court was concerned about the right of prisoners to access to the courts, which it believed could be hampered by punishing inmates for using hostile, sexual, abusive or threatening language in written grievances. We respectfully disagree, for language like that used by Parmelee in the grievances here at issue would not be tolerated for an instant if it were used in a personal restraint petition addressed to the courts, or in any other kind of pleading, for that matter, filed by a person who is not a prisoner. *Cf., In re Marriage of Nielsen*, 38 Wn. App. 586, 687 P.2d 877 (1984) (the power to censure contemptuous behavior is inherent in a court of general jurisdiction); RCW 7.21.010 (defining "contempt of court"); CR 12(f) (upon motion of a party or on the court's own initiative, the court may order redundant, immaterial, impertinent, or scandalous matter to be stricken from any pleading); CRLJ 12(f) (same).

In sum, because the rule prohibiting insolence passes the *Turner* tests, jail authorities did not unreasonably sanction Parmelee when he violated the rule by including scandalous, insolent, and abusive language in his written grievances. It follows that neither the rule itself nor the imposition of the sanctions represented an "exaggerated response" to the legitimate penological concerns that the rule is intended to foster. As both hearing officers painstakingly explained to Parmelee in their written decisions, he needed to understand that the grievance procedure is for the purpose of bringing issues to the attention of the jail authorities, not a forum to make disparaging, degrading, abusive comments about correctional staff. And as both administrative appeal officers explained, Parmelee was not being punished or sanctioned for using the grievance process. Rather, he was being held accountable for the degrading, abusive language he chose to use in the exercise of his right, despite his knowledge of the applicable rule prohibiting insolence.

Parmelee was not " 'wholly stripped' " of his First Amendment rights while he was in jail; but his First Amendment rights were subject to limitation during that time because institutional goals and policies take top priority. *State v. Hartzog*, 96 Wn.2d 383, 391, 635 P.2d 694 (1981) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555-56, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)).

■ Beyond the *Turner* analysis, we deny First Amendment protection to the statements within Parmelee's second grievance that the hearing officer treated as a threat. "True threats" are not protected by the First Amendment. *State v. J.M.*, 144 Wn.2d 472, 477, 28 P.3d 720 (2001); *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265-66 (9th Cir. 1990). A "true threat" is a statement made in a context or under such circumstances in which a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon, or to take the life of another. *State v. Knowles*, 91 Wn. App. 367, 373, 957 P.2d 797 (1998). It is relevant only that the speaker intentionally and knowingly communicated the threat, not that he intended or was able to carry out the threat. *Orozco-Santillan*, 903 F.2d at 1265 n.3. Moreover, the fact that a threat is subtle does not make it less of a threat. *Id.* at 1265.

■ In Parmelee's second grievance, he said, "fire this prick because shitheads like him shouldn't be around prisoners" and that the officer should be fired "before his attitude gets him fucked up." Parmelee claimed that he meant only that he might choose to file a lawsuit against Officer Lewis and that he did not intend to convey any threat to assault the officer. The hearing officer found otherwise, noting that Parmelee had not so qualified the statement when he wrote it, and that it clearly could be seen as an implied threat. It is not our role to substitute our judgment for that of the hearing officer. Indeed, "a detention facility is a unique place fraught with serious security dangers." *State v. Baker*, 28 Wn. App. 423, 425, 623 P.2d 1172 (1981). In the prison context, if not in most other

settings, a reasonable person would foresee that the statements would be taken as a serious expression of an intention to inflict bodily injury. Officer Lewis so construed them, for he charged Parmelee with making a threat. The hearing officer did not violate Parmelee's First Amendment rights by rejecting Parmelee's explanation and by instead agreeing with Officer Lewis's construction of the statements.

Thus, in addition to its insolence, this language constituted a true threat and was unprotected by the First Amendment.

▌▌ A personal restraint petitioner who alleges constitutional error arising from a prison disciplinary hearing "must demonstrate both that he is presently restrained due to constitutional error and that the error worked to his actual and substantial prejudice." *In re Pers. Restraint of Burton*, 80 Wn. App. 573, 585, 910 P.2d 1295 (1996). Although Parmelee is no longer restrained, we elected to address the First Amendment issue he raises, in that it is likely to arise again. The issue has, in fact, arisen before in this court, but has not heretofore been addressed in a published opinion, in that the other cases, like this one, became moot before we could reach them. Although we have remedied that problem here by electing to address the technically moot issue, Parmelee has failed to demonstrate constitutional error arising from his two prison disciplinary hearings. Accordingly, we deny his personal restraint petition.

BECKER, C.J., and ELLINGTON, J., concur.